IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

FRED EARLE P.,[1]

       Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

Civil No. 19-cv-390-DGW[2]

## **MEMORANDUM and ORDER**

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) Benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff applied for DIB and SSI in July 2015, alleging a disability onset date of May 10, 2014. After holding an evidentiary hearing, an ALJ denied the application on May 2, 2018. (Tr. 54-67). The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final agency decision subject to judicial review. (Tr. 1). Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 16.

1

## Issues Raised by Plaintiff

Plaintiff raises the following issues:[3]

1. The ALJ erred in assessing the reliability of plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms.

2. The ALJ "played doctor" by independently interpreting medical evidence.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[4] Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

---

[3] Plaintiff listed a third issue regarding the ALJ's alleged failure to consider the combined effects of his impairments. He did not present any argument on that issue, so it will not be considered.

[4] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The plaintiff bears the burden of proof at steps 1–4. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921

3

(7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date and he was insured for DIB through December 31, 2019. The ALJ found that plaintiff had severe impairments of history of lumbar spine fusion surgery with chronic low back pain; chronic obstructive pulmonary disease (COPD); seizure disorder; meningioma; and mild bilateral foot osteoarthritis.[5]

The ALJ found that plaintiff had the RFC to do light work, which requires occasionally lifting up to 50 pounds and frequent lifting up to 25 pounds. He was able to stand/walk or sit for 6 out of 8 hours a day. He was limited to frequent climbing of stairs and ramps; no climbing of ladders, ropes, or scaffolds; frequent balancing, stooping, kneeling, crouching, and crawling; no concentrated exposure to extreme temperatures, humidity, fumes, odors, dusts, and poor ventilation; and no exposure to dangerous workplace hazards such as exposed moving machinery and unprotected heights.

Based on the testimony of a vocational expert, the ALJ found that plaintiff was able to do his past relevant work as a gas station attendant. He was also able to do other jobs that exist in significant numbers in the national economy.

---

[5] "A meningioma is a tumor that arises from the meninges — the membranes that surround your brain and spinal cord. Although not technically a brain tumor, it is included in this category because it may compress or squeeze the adjacent brain, nerves and vessels." https://www.mayoclinic.org/diseases-conditions/meningioma/symptoms-causes/syc-20355643, visited on December 17, 2019.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1.  **Agency Forms**

Plaintiff was born in 1957 and was 61 years old on the date of the ALJ's decision. (Tr. 257). He said he was disabled because of back problems, emphysema, and COPD. He was 6 feet tall and weighed 182 pounds. He stopped working on May 10, 2014, because "I had fractured ribs at home working on my car. The hospital billed IGA's worker's comp. I went to work one day and the boss came into the area where I worked and started screaming and cussing me and forced me to leave." (Tr. 261). He had worked as a gas station attendant, grocery store manager, and grocery store maintenance person. (Tr. 273).

In August 2015, plaintiff said he could not work because he could not pick anything up or bend over; he had shortness of breath; he had numbness in his feet when he walked; and he coughed until he felt lightheaded. He made sandwiches or frozen meals for himself every day. His sister-in-law did his household chores and yard work. (Tr. 289-295). In February 2016, he reported that he lived alone and did some laundry and cleaning. He shopped for food. He spent his time watching television and using a computer. He drove a car. (Tr. 314-321).

2.  **Evidentiary Hearing**

Plaintiff was represented by an attorney at the hearing in January 2018. (Tr. 74).

Plaintiff testified that he worked for a few years as a gas station attendant at an IGA store. He stopped working because he "couldn't hardly do the job anymore." He asked "Joe" about getting an easier job, but Joe did not have anything. Then, Joe sent a minor in to buy cigarettes to test him, and plaintiff "got fired over that." Plaintiff said, "But yet, when that happened, he kept me another two weeks after that happened." (Tr. 82). Plaintiff later testified that he was fired because he broke some ribs and the hospital mistakenly billed IGA's workers' compensation carrier for his medical bills. (Tr. 106).

Plaintiff testified that he had back pain after sitting or standing for a while. He used a TENS unit. (Tr. 91). He had migraines almost every day lasting 20 minutes to three hours. He started having seizures around December 2016. He also had COPD. (Tr. 93-96). He had been diagnosed with a tumor on top of his brain stem. The seizures could be caused by the tumor or by epilepsy. (Tr. 99-100).

His nieces and nephews did his shopping and chores. (Tr. 97).

A vocational expert (VE) also testified. The VE testified that a person with plaintiff's RFC assessment could do plaintiff's past work, and also could do other jobs at the medium exertional level. (Tr. 112-113).

### 3. Relevant Medical Records[6]

Plaintiff's back pain was treated by Dr. Kovalsky and PA Haertling. In February 2014, Dr. Kovalsky noted that plaintiff had a fusion at L4-5 and L5-S1 for

---

[6] Plaintiff submitted additional records to the Appeals Council in connection with his request for review. Those records post-dated the ALJ's decision. See, Tr. 2. The Court cannot consider those records in reviewing for substantial error. *Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 366, n. 2 (7th Cir. 2004).

isthmic spondylolisthesis and degenerative disc disease in the past. He had a work-related injury the previous year. He was working full time. He took Hydrocodone. Dr. Kovalsky felt he was not a candidate for surgery. Plaintiff was to continue on regular work duty and to return in 6 months. (Tr. 367).

Plaintiff returned in May 2014, complaining of a "severe increase in his symptoms." On exam, his gait and station were normal. He had back pain with forward flexion and extension. Dr. Kovalsky prescribed Prednisone. (Tr. 364). In November 2014, plaintiff told Dr. Kovalsky that he had a "contested" workers' compensation claim and was no longer working at IGA because he could not do the bending and lifting. He was working as a cab driver. On exam, he had mildly positive hyperextension test on the right, negative bowstring test, negative Valsalva test, and negative straight leg raising. He was neurologically intact in the L3 to S1 dermatomes. The doctor saw no indication to get an MRI or pursue surgical treatment. Plaintiff was to continue taking Hydrocodone and Amitriptyline, and was to see PA Haertling for medication management. (Tr. 361).

A drug test was negative for Hydrocodone in September 2015. Plaintiff said he had been trying to take Hydrocodone only when he needed it and he had been out of it for 2 days. PA Haertling wrote "He doesn't need to be seen for med management if he is not taking his [N]orco. This is very suspicious and it looks like he is giving his [N]orco away or selling it." (Tr. 518-522). In November 2015, PA Haertling wrote a letter to plaintiff informing that he would no longer treat him "because you have consistently failed to come in for scheduled appointments." (Tr. 540).

7

Plaintiff was diagnosed with COPD at Physicians Rural Health Clinic in July 2014. He was prescribed a Spiriva inhaler. A smoking cessation plan was discussed. The inhaler was changed the next month as he was not responding to Spiriva, and a rescue inhaler was added. (Tr. 420-424). He was diagnosed with acute bronchitis in February 2015. (Tr. 419). He was smoking 3 packs of cigarettes a day in March 2015. He had inspiratory and expiratory wheezes on exam. He was "sternly counselled" that he must discontinue smoking. (Tr. 414-416). About a week later, his breath sounds were normal with no wheezing. Oxygen saturation was 96%. (Tr. 411-412). The last office visit there was in July 2015. He said the doctor had put him on ProAir, Spiriva, and Symbicort inhalers, which had worked for 3 or 4 months, but they no longer worked. He had decreased breath sounds, but no wheezing, rales, rhonchi, or crackles on exam. The plan was to obtain a CT of the chest (Tr. 390-393). The CT showed minimal emphysematous changes, no pulmonary nodules, no mediastinal mass, and no adenopathy. (Tr. 467).

At some point, FNP Schaufelberger began providing primary care to plaintiff. The first note is from June 2016. Plaintiff was using Albuterol Sulfate .083% Nebulization Solution every 6 hours. He also used a ProAir HFA inhaler as needed. The nebulizer treatment was said to be positive as his oxygen saturation was 92% before administration and 98% after. After walking, his oxygen saturation went down to 91%. He was to continue using the nebulizer every morning and evening. (Tr. 541). His COPD was exacerbated in August 2016, and FNP Schaufelberger prescribed a Z-Pak. He was to follow-up the next week. (Tr.

8

543).  The next visit with FNP Schaufelberger was in April 2017.  He had been diagnosed with a meningioma.  He was to continue using his inhalers.  (Tr. 545-546).  He was seen later that month for a left foot sprain.  He was smoking 2 packs a day and was "not interested in stopping smoking."  (Tr. 547).

In December 2016, an MRI of the brain showed a tumor which might be a meningioma.  (Tr. 551-552).

Plaintiff began seeing Dr. Nemani, a neurologist, and PA Buckett in February 2017.  He complained of episodes where his eyes were open, but he could not control his actions.  The impression was syncope, possible seizure disorder, and possible TIA.  Dr. Nemani encouraged him to taper off smoking as smoking can cause "microvascular disease which he may be suffering from right now."  He prescribed Keppra, an anti-seizure medication.  An EEG was abnormal, and a second brain MRI again showed the tumor.  In July 2017, plaintiff complained of severe headaches.  He had been referred to a neurosurgeon for evaluation of his meningioma.  Dr. Nemani increased the dosage of Keppra.  Plaintiff was to return in 3 months, sooner if his headaches got worse.  (Tr. 582-587).  There are no further records from Dr. Nemani.

Plaintiff was seen by a neurosurgeon at Barnes-Jewish Hospital in St. Louis in January 2018.  A repeat MRI showed a stable right-sided meningioma with no significant mass effect on the pons.[7]  Plaintiff complained of seizure-like episodes once a week even though he was taking Keppra and Depakote, and headaches which had become more severe in the past two months.  Physical exam was normal.

---

[7] The pons is a portion of the brainstem.  https://medical-dictionary.thefreedictionary.com/pons, visited on December 18, 2019.

The doctor concluded that no surgical intervention was indicated. He recommended a repeat MRI in a year and that plaintiff remain under a neurologist's care for headaches and seizure management. (Tr. 593-594).

### 4. State Agency Consultant's Opinion

In April 2016, Dr. Stevens assessed plaintiff's RFC based on a review of the record. He concluded that plaintiff could do medium exertion work limited to frequent climbing of stairs and ramps as well as ladders, ropes, and scaffolds; frequent balancing, stooping, kneeling, crouching, and crawling; and no concentrated exposure to extreme temperatures, humidity, fumes, odors, dusts, and poor ventilation. (Tr. 145-147).

## **Analysis**

Plaintiff first challenges the ALJ's finding that his subjective complaints were not supported by the record.

SSR 16-3p supersedes the previous SSR on assessing the reliability of a claimant's subjective statements. SSR 16-3p became effective on March 28, 2016 and is applicable here. 2017 WL 5180304, at *1.

SSR 16-3p eliminates the use of the term "credibility," and clarifies that symptom evaluation is "not an examination of an individual's character." SSR 16-3p continues to require the ALJ to consider the factors set forth in the applicable regulation, 20 C.F.R. § 404.1529. *Ibid.*, at *10.

The new SSR does not purport to change the standard for evaluating the claimant's allegations regarding his symptoms. Thus, prior Seventh Circuit precedents continue to apply.

10

The findings of the ALJ as to the accuracy of the plaintiff's allegations are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

Plaintiff makes four complaints about the assessment of his subjective allegations. He first takes issue with the ALJ's statement that plaintiff's allegations were "not entirely consistent" with the other evidence in the record. According to plaintiff, the "entirely consistent" language indicates that the ALJ applied an incorrect standard. This argument is borderline frivolous. The "not entirely consistent" language is, as plaintiff asserts, boilerplate language that appears in many ALJ decisions. However, the use of boilerplate language is harmless where the ALJ goes on to give his reasons for his decision. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). The use of the phrase "not entirely consistent" does not suggest that the ALJ used an incorrect standard. The ALJ cited the correct standard at Tr. 59 and discussed the relevant factors in assessing plaintiff's allegations.

Plaintiff next argues that the ALJ was wrong to point out inconsistencies in his statements about why his job at the gas station ended. According to plaintiff

11

this violated SSR 16-3p's prohibition against engaging in "examination of an individual's character." This argument goes nowhere. Plaintiff made inconsistent statements about why his job ended. Whether he left his job because he was physically unable to do it, or he was fired for selling cigarettes to a minor is certainly relevant to the disability determination.

Plaintiff argues that the ALJ's reference to his continued smoking was error, citing *Shramek v. Apfel*, 226 F.3d 809, 812-13 (7th Cir. 2000). *Shramek* did hold that the ALJ erred in discounting the plaintiff's statements because she continued to smoke. However, in that case, there was no evidence linking the plaintiff's symptoms to her smoking. Here, in contrast, there was such evidence, as the ALJ pointed out. There was also evidence that plaintiff told a healthcare provider that he was "not interested" in quitting. (Tr. 64). This distinguishes *Shramek*. Plaintiff argues that the ALJ was required to consider reasons why he did not try to quit, such as "the need for medication to assist with quitting smoking that the claimant cannot afford, or which may have caused intolerable side-effects in the past." Doc. 23, p. 9. This argument is not supported by anything in the record; there is no evidence that he needed medication to quit smoking but was unable to get it. The record indicates that plaintiff was covered by Medicaid. See, Tr. 468, 590. Further, plaintiff did not offer this reason at the hearing. Plaintiff was represented by an attorney and was presumed to have put on his best case for benefits. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007).

Lastly, plaintiff argues that the ALJ ignored medical evidence in evaluating his statements about his COPD symptoms. Plaintiff argues that the ALJ ignored

the drop in his oxygen saturation level with walking in June 2016 and his use of Albuterol Sulfate 0.083% nebulizer solution every 6 hours beginning in April 2017. Plaintiff seems to be arguing that this evidence shows his COPD worsened as of April 2017, but the second assertion is factually incorrect. The record establishes that plaintiff was using Albuterol Sulfate 0.083% nebulizer solution every 6 hours back in June 2016. (Tr. 541). The ALJ acknowledged that he used several different inhalers. (Tr. 61). And, there is no medical evidence establishing that the drop in oxygen saturation level after walking is particularly significant. FNP Schaufelberger noted the finding but did not change plaintiff's treatment in response, and she never referred to his oxygen saturation level again. (Tr. 541-550).

Tellingly, plaintiff ignores the other reasons given by the ALJ. The ALJ noted benign findings on medical exams. (Tr. 60-62). He also cited PA Haertling's suspicion that plaintiff was selling or giving away his Norco, suggesting that his pain was not as severe as he claimed. (Tr. 65). These two reasons alone support the ALJ's conclusion as to the accuracy of plaintiff's statements. His conclusion was supported by the evidence and was not "patently wrong;" it must therefore be upheld. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

For his second point, plaintiff argues that the ALJ erred by determining for himself the significance of the medical evidence involving his meningioma, seizures, and headaches.

The ALJ gave "good weight" to the state agency consultant's opinion while acknowledging that the medical evidence related to plaintiff's meningioma and

13

seizures was not reviewed by the consultant. The ALJ said he accounted for plaintiff's meningioma and seizures by limiting him to no climbing of ladders, ropes, or scaffolds. (Tr. 63). He also limited him to no exposure to dangerous workplace hazards such as exposed moving machinery and unprotected heights (Tr. 59) but did not give a reason for that limitation.

To the extent that plaintiff's is arguing that the ALJ erred by crafting his own RFC rather than relying on a medical opinion, his point is rejected. The ALJ "must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions. . . ." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). The determination of RFC is an administrative finding that is reserved to the Commissioner. 20 C.F.R. §404.1527(d)(2).

Citing *Murphy v. Colvin*, 759 F.3d 811, 818 (7th Cir. 2014), plaintiff argues that the ALJ's RFC determination must be fully grounded in the testimony or the medical evidence. That proposition is not open to debate. Plaintiff's argument does not carry the day because the ALJ's determination was grounded in the medical evidence.

Plaintiff argues that the ALJ was "not remotely qualified" to review the medical records related to his meningioma, headaches, and seizures and then craft an RFC assessment. The meningioma was first noted on an MRI in December 2016. (Tr. 551-552). In January 2018, a neurosurgeon wrote that a repeat MRI showed a stable right-sided meningioma with no significant mass effect on the pons. The doctor concluded that no surgical intervention was indicated. He

14

recommended a repeat MRI in a year and that plaintiff remain under a neurologist's care for headaches and seizure management. (Tr. 593-594). The ALJ discussed those records as well as the records from the neurologist, Dr. Nemani. (Tr. 62).

Notably, the ALJ did not rely on his own interpretation of the January 2018 MRI. Rather, he relied on the neurosurgeon's interpretation as set forth in the doctor's office note. This distinguishes this case from cases in which the Seventh Circuit found that the ALJ erred in interpreting MRI results for himself. See, e.g., *Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018); *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018). Here, the ALJ considered the medical evidence and formulated an RFC assessment based on the record as a whole without relying on his own lay interpretation of the medical evidence. That is the ALJ's proper role. 20 C.F.R. §404.1527(d)(2).

Lastly, plaintiff again argues that the ALJ erred in failing to consider the drop in oxygen saturation after walking and his use of Albuterol Sulfate 0.083% nebulizer solution every 6 hours. As had already been explained, this was not reversible error.

Plaintiff's arguments are little more than an invitation for this Court to reweigh the evidence. He has not identified a sufficient reason to overturn the ALJ's conclusion. Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Burmester,* 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:   February 18, 2020.**

**DONALD G. WILKERSON
U.S. MAGISTRATE JUDGE**